**No. 15-3846**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

Diane **BOLDERSON,**

Plaintiff-Appellant,

v.

## CITY OF WENTZVILLE,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NO. 4:13-CV-02223-CEJ

## OPENING BRIEF OF APPELLANT

Kevin J. Dolley
Mark J. Obermeyer
LAW OFFICES OF KEVIN J. DOLLEY, LLC
2726 S. Brentwood Blvd.
St. Louis, MO 63144
(314) 645-4100
(314) 736-6216 (fax)

Ryan C. Mielcarek
MIELCAREK LAW FIRM, LLC
2726 S. Brentwood Blvd.
St. Louis, MO 63144
(314) 645-4100
(314) 736-6216 (fax)

*Attorneys for Plaintiff-Appellant Diane Bolderson*

Dated: February 1, 2016

# SUMMARY OF THE CASE

On November 4, 2013, Plaintiff-Appellant Diane Bolderson ("Bolderson" or "Plaintiff") filed a lawsuit against Defendant-Appellee City of Wentzville ("Defendant" or "Wentzville"), asserting claims of retaliation in violation of her First Amendment rights and gender discrimination in violation of the Missouri Human Rights Act. Beginning in March 2013, Bolderson began making complaints regarding potential corruption involving certain Wentzville officials. On May 10, 2013, four days after her last complaint, Wentzville terminated Bolderson's employment.

This is an appeal from the District Court's grant of summary judgment on Bolderson's First Amendment claim. The District Court for the Eastern District of Missouri ("District Court") held Bolderson's speech was not protected by the First Amendment because it was made pursuant to her official job duties and caused actual disruption of Defendant's operations. The District Court erred by: (1) failing to consider substantial record evidence demonstrating Bolderson spoke as a private citizen; (2) mischaracterizing record evidence as to whether her speech disrupted Defendant's operations; (3) misconstruing record evidence in a light solely favorable to Defendant under *Pickering*; and (4) inconsistently applying legal standards throughout its analysis.

Plaintiff respectfully requests fifteen (15) minutes of oral argument per side.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... v

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .................... 2

STATEMENT OF THE CASE ............................................................... 3

SUMMARY OF ARGUMENT ............................................................ 17

ARGUMENT ..................................................................................... 18

I. The District Court Erred In Granting Defendant's Motion For
   Summary Judgment On Bolderson's First Amendment Claim Because
   It Failed To Properly Consider And Construe Record Evidence As
   Required By The Summary Judgment Standard Of Review ........................ 18

   A. Standard of Review ........................................................... 18

   B. The District Court Erred By Failing To Construe Record
      Evidence In A Light Favorable To Bolderson And By Ignoring
      Substantial Record Evidence Creating Genuine Issues Of
      Material Fact As To Whether Bolderson Spoke As A Private
      Citizen On Matters Of Public Concern. .............................. 19

      i. The District Court Ignored Substantial Record Evidence
         Demonstrating Bolderson Spoke As A Private Citizen ........... 21

         a. The District Court Improperly Disregarded Critical
            Record Evidence Demonstrating Bolderson Did
            Not Report Potential Fraud and Corruption
            Pursuant To Her Official Job Duties .............................. 24

         b. The District Court Ignored And Misconstrued
            Record Evidence On The Nature And Scope Of
            Bolderson's Official Job Duties In Concluding
            Such Duties Entailed An Affirmative Duty To
            Report Fraud And Corruption… .................................... 26

Appellate Case: 15-3846     Page: 3     Date Filed: 02/02/2016 Entry ID: 4362766

c.      The District Court Lacked Any Basis At Law To
        Conclude The Record Evidence Established
        Bolderson Had An Affirmative Duty To Report
        Fraud And Corruption ....................................................33

d.      The District Court's Finding That Bolderson
        Admitted She Reported Corruption Pursuant To
        Her Official Job Duties Wholly Ignores The
        Record Evidence And The Applicable Standard of
        Review ..........................................................................37

e.      The District Court Lacked Any Basis In Law To
        Conclude Bolderson Admitted She Reported
        Corruption And Fraud Pursuant To Her Official
        Job Duties. ....................................................................39

C.  The District Court Erred By Misconstruing The Applicable
    Legal Standard And The Record Evidence In Addressing
    Whether The *Pickering* Test Applies ..................................................42

    i.      The District Court Erroneously Held Defendant Need
            Not, As A Matter Of Law, Produce Evidence Of Actual
            Disruption Caused By Protected Speech Before Applying
            The *Pickering* Test ....................................................42

    ii.     The District Court Misconstrued Record Evidence In
            Concluding Bolderson's Speech Caused Actual
            Disruption....................................................................44

D.  To the Extent *Pickering* Applies, the District Court Erred By
    Ignoring And Misconstruing Substantial Record Evidence In
    Concluding Bolderson's Termination Was Justified ..........................51

    i.      The District Court Ignored Substantial Record Evidence
            Demonstrating Bolderson's Speech Was Well-Founded
            And Involved the Public Interest. ............................................53

    ii.     The District Court Erroneously Relied Upon Factually
            Inapposite Legal Precedent In Concluding Bolderson

iii

Levelled Personal Attacks Without Substantive Evidence Of Her Concerns ........................................................................55

iii.    The District Court Misconstrued Record Evidence In Concluding Plaintiff's Speech Impeded Her Ability To Perform Her Job Duties. .........................................................58

iv.    The District Court's Finding That Employee Acts of Insubordination Tipped The Balance Of The *Pickering* Factors In Favor Of Defendant Lacks Any Basis In The Record Evidence. ...................................................................62

CONCLUSION ........................................................................63

iv

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................18

*Anzaldua v. Northeast Ambulance & Fire Prot. Dist.*,
793 F.3d 822 (8th Cir. 2015) ..................................... 20, 42-43, 53

*Bailey v. Dep't of Elem. & Secondary Educ.*,
451 F.3d 514 (8th Cir. 2006) ........................................... 32, 39-42

*Barclay v. Michalsky*,
451 F. Supp. 2d 386 (D. Conn. 2006) ........................................35

*Batt v. City of Oakland*,
2006 WL 1980401 (N.D. Cal. July 13, 2006) ........................ 33-36

*Belk v. City of Eldon*,
228 F.3d 872 (8th Cir. 2000) ..................................... 43-44, 50, 52

*Bonn v. City of Omaha*,
623 F.3d 587 (8th Cir. 2010) ................................................. 39-42

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................18

*Dahlia v. Rodriguez*,
735 F.3d 1060 (9th Cir. 2013) ............................................... 23-24

*Densmore v. City of Maywood*,
320 F. App'x 497 (9th Cir. 2008)..................................................34

*Dillon v. Suffolk County Dept. of Health Services*,
917 F. Supp. 2d 196 (E.D.N.Y. 2013)..........................................28

*Evergreen Inv., LLC v. FCL Graphics, Inc.*,
334 F.3d 750 (8th Cir. 2003) ........................................................18

v

Appellate Case: 15-3846    Page: 6    Date Filed: 02/02/2016 Entry ID: 4362766

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)................................................................... 20-24, 26, 40

*Givhan v. W. Line Consol. Sch. Dist.*,
    439 U.S. 410 (1979)....................................................................20

*Greisen v. Hanken*,
    2015 WL 9484479 (D. Ore. Dec. 29, 2015)...................................27

*Hall v. Missouri Highway and Transp. Comm'n*,
    995 F. Supp. 1001 (E.D. Mo. 1998) ..............................................57

*Hemminghaus v. Missouri*,
    2013 WL 588197 (E.D. Mo. Feb. 13, 2013) ...................................43

*Kincade v. City of Blue Springs, Mo.*,
    64 F.3d 389 (8th Cir. 1995) ..........................................................47

*Lane v. Franks*,
    134 S. Ct. 2369 (2014).................................................................22

*Lindsey v. Orrick*,
    491 F.3d 892 (8th Cir. 2007) ...................21, 24-25, 27, 38, 42-44, 46, 57, 62

*Livingston v. Bartis*,
    2008 WL 185791 (E.D. Mo. Jan. 18, 2008) ............................ 33-34

*Lyons v. Vaught*,
    781 F.3d 958 (8th Cir. 2015) .......................................................20

*McCullough v. Univ. of Arkansas for Med. Sci.*,
    559 F.3d 855 (8th Cir. 2009) .......................................................20

*Medtronic, Inc. v. U.S. Xpress, Inc.*,
    341 F.3d 798 (8th Cir. 2003) ................................................. 18-19

*Montgomery v. Board of County Comm'rs of Douglas County*,
    637 F. Supp. 2d 934 (D. Col. 2009) ..............................................28

Appellate Case: 15-3846    Page: 7    Date Filed: 02/02/2016 Entry ID: 4362766

*Paola v. Spada*,
  498 F. Supp. 2d 502 (D. Conn. 2007) ...........................................................34

*Pickering v. Bd. of Educ.*,
  391 U.S. 563 (1968)..................................... 3, 17, 21, 42-44, 46, 50-53, 62-63

*Porter v. Dawson Educ. Serv. Co-op*,
  150 F.3d 887 (8th Cir. 1998) ................................................................. 59-62

*Reinhardt v. Albuquerque Public Schools Bd. of Educ.*,
  595 F.3d 1126 (10th Cir. 2010) ....................................................................24

*Robert Johnson Grain Co. v. Chem. Interchange Co.*,
  541 F.2d 207 (8th Cir. 1976) ........................................................................19

*Sexton v. Martin*,
  210 F.3d 905 (8th Cir. 2000) ........................................................................47

*Smith v. Cleburne Cty. Hosp.*,
  870 F.2d 1375 (8th Cir. 1989) ......................................................................55

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..............................................................................30, 32

*Washington v. Normandy Fire Prot. Dist.*,
  272 F.3d 522 (8th Cir. 2001) ........................................................................42

## STATUTES, REGULATIONS, AND OTHER AUTHORITIES

28 U.S.C. § 1331 ...............................................................................................1

42 U.S.C. § 1983...........................................................................1, 17, 19, 28, 63

Fed. R. Civ. P. 56(c).......................................................................................18

Appellate Case: 15-3846   Page: 8   Date Filed: 02/02/2016 Entry ID: 4362766

# JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based upon Plaintiff's claims under the First Amendment and 42 U.S.C. § 1983. On November 30, 2015, the District Court entered an order granting summary judgment in favor of Defendant. (Add. 1-23).[1] On December 9, 2015, Plaintiff timely filed her notice of appeal pursuant to Fed. R. App. P. 4(a). Because the District Court's judgment is a final order, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] Documents in Plaintiff's Appendix are cited as "App. __." In accordance with 8th Cir. R. 30A(b)(3), the Appendix is consecutively paginated with page numbers in the bottom right hand corner. Documents in the Addendum to Plaintiff's brief are cited as "Add. __" with similar pagination placement as the Appendix.

1

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

I.     Whether the District Court erred in granting Defendant's Motion for Summary Judgment on Bolderson's First Amendment claim.

Plaintiff submits the following legal authorities are most apposite to the issue for review:

- *Lindsey v. Orrick*, 491 F.3d 892 (8th Cir. 2007)

- *Belk v. City of Eldon*, 228 F.3d 872 (8th Cir. 2000)

- *Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389 (8th Cir. 1995)

- *Lane v. Franks*, 134 S. Ct. 2369 (2014)

Appellate Case: 15-3846     Page: 10     Date Filed: 02/02/2016 Entry ID: 4362766

## STATEMENT OF THE CASE

On November 4, 2013, Bolderson filed a Complaint in the United States District Court for the Eastern District of Missouri, alleging *inter alia* Defendant terminated her for exercising her First Amendment right to speak on matters of public concern as a private citizen. (App. 10).

On August 18, 2015, Plaintiff filed a Motion for Partial Summary Judgment on her First Amendment claim. (App. 32). On August 21, 2015, Defendant filed a Motion for Summary Judgment on Plaintiff's First Amendment claim. (App. 1205). On November 30, 2015, the District Court denied Plaintiff's Motion for Partial Summary Judgment and granted Defendant's Motion for Summary Judgment. (App. 1764). The District Court concluded: (1) Plaintiff's speech addressed a matter of public concern, but was made pursuant to her official job duties; (2) her speech caused disruption; and (3) even if she spoke as a private citizen, her First Amendment claim fails under *Pickering*. (App. 1749-63).

A.    Plaintiff's Employment

On June 15, 1998, Plaintiff began working for Wentzville and was employed there for nearly fifteen (15) years as Building Commissioner. (App. 105, 340). During her employment, Plaintiff wrote ordinances, adopted construction codes, ensured building plans were complete and public works projects had an engineer of record, and inspected new construction along with other persons and departments.

Appellate Case: 15-3846    Page: 11    Date Filed: 02/02/2016 Entry ID: 4362766

(App. 1305-06; Bolderson Dep., 87:14-21, 124:10-19). Bolderson's job duties did not involve reporting potential corruption or fraud. (App. 1305-06). Plaintiff consistently met and/or exceeded Defendant's expectations for her position and consistently received favorable performance evaluations. (App. 487, 692-699, 877-882; Forebeck Dep., 110:21-24; Mixen Dep., 119:12-126:14; Guccione Dep., 94:20-99:7).

Beginning in 2010, Douglas Forebeck ("Forebeck") served as Plaintiff's direct supervisor. (App. 478; Forebeck Dep., 101:1-10). Forebeck never disciplined Plaintiff prior to her termination. (App. 495; Forebeck Dep., 17:21-25, 118:5-16). Beginning in March 2013, Michael McDowell ("McDowell") — the then-newly hired City Administrator—assumed some supervisory authority over Plaintiff. (App. 130, 354). Notably, no one made complaints regarding Bolderson from January 2013 up until May 10, 2013. (App. 740; Mixen Dep., 167:9-14).

B.    The Splash Station Project

Beginning in November 2012, Wentzville undertook the development of the Splash Station Aquatic Park ("Splash Station" or "Project"), a public pool and water park. (App. 1023). Planning Design Studio, LLC ("PDS") served as the general contractor on the Project and sub-contracted with Jacobs Engineering Group, Inc. ("Jacobs") and Water's Edge Aquatic Design, LLC ("Water's Edge") to perform work on the Project. (App. 1027-28, 1051). Collectively, PDS, Jacobs

4

and Water's Edge comprised the design team and acted as the engineer of record for the Project. (App. 1027-28, 1051). Defendant also used City employees to oversee the Project. (App. 1022). Defendant's City Engineer, Scott Hitchcock ("Hitchcock"), was responsible for project oversight and worked closely with PDS to ensure the Project timely progressed. (App. 1023).

On April 5, 2013, Defendant submitted a Request for Proposal ("RFP"), which only provided five (5) days for submission of bids (*i.e.*, a bid deadline of April 10, 2013). (App. 1122). The five (5) day window was significantly shorter than is customary for this type of bid. (App. 1014). The RFP sought proposals for project management services for the Splash Station Project and listed an estimated completion date of September 2013. (App. 1124). The RFP included in the scope of services a request for Project management, coordination, budget controls, scheduling, administration and Project engineering and inspection services. (App. 1122-30).

In response to the RFP, Creative Construction Services Group, Inc. ("CCS") and Gartenberg Construction Consulting Services, Inc. ("Gartenberg") submitted their respective proposals. (App. 1155-56, 1158-59). CCS proposed a bid with fees and costs capped at $80,000, which also included the possibility of Wentzville recouping a portion of fees upon completion of the Project. (App. 1156). CCS was knowledgeable about the Project as they had worked on it previously and

5

employed licensed engineers who were able to carry out plan changes to the Project. (App. 1155). In comparison, Gartenberg proposed a fee of $87,300, plus reimbursable expenses. (App. 1158). Gartenberg was not a licensed engineer and was not qualified to make changes to the Project. (App. 1160).

### C. The April 10, 2013 Board of Aldermen Meeting

On April 10, 2013, the Board of Aldermen held their bi-monthly meeting at City Hall. (App. 1132). The initial discussion related to the progression of the Project and included a brief update by Interim Public Works Director Doug Lee ("Lee"). (App. 1134). Shortly after the Project update, a motion was made to terminate the contract with PDS. (App. 1134). The main reason cited for terminating the contract was a desire to speed up the construction phase of the Project. (App. 1134).

The Board of Aldermen asked McDowell to present a plan for the Board's consideration. (App. 1134). McDowell stated two well-known firms—CCS and Gartenberg—submitted proposals to take over as Project manager for the Project. (App. 1134).

McDowell then made the following disclosures at the meeting: (1) CCS had worked for PDS on the Project regarding the initial construction scheduling; and (2) McDowell had a "business association" with Gartenberg when they were employed together at the City of Olivette. (App. 1134-35). After the conclusion of

6

McDowell's presentation, Alderman Kross ("Kross") expressed concern that it would be better to address who to hire at a later date since it was not placed on the agenda. (App. 1135).

The meeting minutes show no detailed discussion regarding the two bids, or a comparison of the proposed fees therein, occurred. (App. 1132-53). Despite not presenting this information at the meeting, McDowell recommended selecting Gartenberg for management and oversight of the Project. (App. 1134). A motion was made to adopt Gartenberg's proposal, in the amount of $87,300, and the motion was carried by a majority of the Board of Aldermen. (App. 1135).

D.    The Gartenberg Contract

On April 19, 2013, Mayor Guccione executed a contract for Gartenberg to manage and oversee the Project ("Gartenberg Contract"). (App. 1167-1175). However, the Gartenberg Contract differed from Gartenberg's initial proposal in two significant ways. First, under the Gartenberg Contract, Wentzville would pay Gartenberg $87,300, plus reimbursable expenses, for services provided *up to September 7, 2013*. (App. 1168). After September 7, 2013, Wentzville would have to pay Gartenberg at the hourly billing rate of $145.00 for its services, even though the RFP sought services for *completion* of the Project—not services for a set period of time. (App. 1186).

7

Second, the Gartenberg Contract added an additional ten percent (10%) mark-up on any reimbursable expenses incurred by Gartenberg during the Project and further allowed him to recover mileage costs to and from the job site. (App. 1168). These terms were not disclosed in Gartenberg's proposal to the Board. (App. 1158-59).

### E. Defendant Did Not Follow Procedure With Regard to the Gartenberg Contract

The Wentzville engineering department typically contracts with third parties for the provision of professional services. (App. 1008; Hitchcock Dep., 46:15-17). The RFP for the Splash Station Project was drafted and issued by the Director of the Procurement Department, Jerry Hillin ("Hillin"). (App. 1008). The five-day window for Project bids was not consistent with Wentzville's normal or customary practices. (App. 1014; Hitchcock Dep., 52:17-53:5). Nonetheless, the Board of Aldermen voted to terminate the contract with PDS and, at the recommendation of McDowell, voted to award the bid to McDowell's business associate—Gartenberg. (App. 1135). City employees who would be directly affected by such contract changes, such as City Engineer Hitchcock, are normally consulted regarding the contract changes; here, however, Hitchcock and other City employees were not consulted with regarding the Gartenberg Contract. (App. 1013-14; Hitchcock Dep., 51:4-52:16).

8

F.      Plaintiff Complained About Matters of Public Concern Relating to the
        Misuse of Tax Payer Funds

On April 22, 2013, Plaintiff sent a memorandum to McDowell, Forebeck,

Hitchcock and Parks Director Mary Jo Dessieux ("Dessieux") ("April 22, 2013

Memo"). (App. 1177-79).  Plaintiff noted Gartenberg was not a licensed engineer

or architect and was unable to make changes necessary to the progression of the

Project. (App. 1178). Additionally, Plaintiff questioned the Gartenberg Contract as

a significant and unnecessary cost to the taxpayers because Gartenberg, who was

neither a licensed architect nor engineer, could not provide the City with necessary

services on the Project. (App. 1178).   Despite the significance of Plaintiff's

concerns, Wentzville failed to take any remedial action or investigate the matter.

(App. 289; Bolderson Dep., 217:10-15).

The April 22, 2013 Memo was not merely about "enforcing building codes."

(App. 1177-79).  Bolderson explained in the April 22, 2013 Memo she considered

Wentzville's actions of (1) hastily hiring McDowell's business associate,

Gartenberg (who was not a licensed architect or engineer, as required for the

Project) and (2) planning to rehire the previous subcontractors with whom

Wentzville recently cancelled its contract in order to cure Gartenberg's lack of

licensure, presented not only legal issues related to the Project's compliance with

applicable regulations and statutes, but also a serious ethical issue about potential

collusion between Wentzville and Gartenberg. (App. 1178-79).

9

On May 6, 2013, Bolderson sent an email to Mayor Guccione, Dessieux, Hitchcock, and the City's Human Resource Director—Amy Mixen ("Mixen")— concerning specific instances of potential fraud within Wentzville ("May 6, 2013 Memo"). (App. 1181-99). Specifically, Bolderson complained about the Board of Aldermen having hired Gartenberg (who was not a licensed architect or engineer) to manage the Project without holding a proper bidding process. (App. 1183-85). Bolderson stated: "[the] Board has stopped asking staff for legitimate and honest answers to questions that are clearly outside the scope of their understanding, as was [the Gartenberg Contract]. [The] Board has been acting as vigilante since 2010 when staff were ridiculed and terminated at the drop of a hat by bully's [sic]." (App. 1185).

Bolderson further stated: "[m]y [April 22, 2013 memorandum to Forebeck] which should have been a red flag for those who received it fell without an answer except for ridicule from Doug Forebeck for using the wrong terminology in describing a change from the approved plan….everyone wants to turn a blind eye to corruption." (App. 1185). Mayor Guccione was not concerned with Bolderson's complaints, which he merely "glanced" through and turned over to McDowell. (App. 898; Guccione Dep., 115:18-116:6).

In the May 6, 2013 Memo, Bolderson indicated she was "tak[ing] a stand with [her] moral convictions guiding [her]." (App. 1185) "From [her] perspective

10

[Wentzville's actions were] nothing short of stealing from the Community." (App. 1185-86). Bolderson noted in detail several issues suggesting Wentzville officials were unlawfully engaged in "self-dealing": (1) misrepresentations to the Board regarding fault for overlooking the large amount of rock on site; (2) misrepresentations to the Board about terminating the PDS contract; (3) misrepresentations by the Board about professional oversight and Sunshine Law compliance; (4) misrepresentations by McDowell about Gartenberg; (5) misrepresentations by Hillin about the scope of services to be provided by Gartenberg; and (6) misrepresentations to the community about the need for Gartenberg's services. (App. 1181-87). Bolderson further encouraged the Mayor to assign someone who was actually responsible for investigating and reporting such issues. (App. 1181).

On May 7, 2013, Hitchcock sent a complaint directly to Mayor Guccione, Mixen and Paul Rost ("Rost"), the City Attorney, regarding potential Code of Ethics violations related to the execution of the Gartenberg Contract ("May 7, 2013 Memo"). (App. 1652-55). The May 7, 2013 Memo contained several of the same allegations of fraud and corruption against McDowell, Hillin and the Board of Alderman as Bolderson's May 6, 2013 Memo. (App. 1652-55).

11

G.  McDowell, Mixen, Rost and Schraeder Immediately Discuss
    Plaintiff's Termination

On or about May 7, 2013, Mixen, McDowell, Rost and Ivan Schraeder ("Schraeder"), Defendant's counsel, met to discuss the "fraud allegations" raised by both Bolderson and Hitchcock. (App. 1292). Schraeder did not believe the concerns expressed by Bolderson in the April 22, 2013 Memo met "the requirements of the Code of Ethics." (App. 1292). Schraeder, Mixen, Rost and McDowell engaged in a discussion to determine whether Bolderson was a whistleblower. (App. 1292). They determined Plaintiff's complaints were not merited because, according to them, "[t]he Board has absolute discretion in this matter." (App. 1292). They also had a "[b]rief discussion regarding how defensible [Plaintiff's] termination is and the possibility of this going public." (App. 1292).

Schraeder, Mixen, Rost and McDowell ultimately concluded Bolderson's termination was merited because "she [did] not meet the definition of a whistleblower and if she did she would have to report to the proper authority." (App. 1292). With respect to Plaintiff's purported "insubordination," Defendant concluded "[s]he was given a direct order not to speak to the Mayor (Nick) so instead she spoke to his spouse, which is insubordination and the issue of inappropriate allegations." (App. 1292). Defendant notably does not state who purportedly gave Plaintiff a "direct order" not to speak with Mayor Guccione. (App. 1292).

12

Mixen testified Plaintiff's termination "was [McDowell's] decision." (App. 740; Mixen Depo., 167:2-17). When asked whether Plaintiff "fail[ed] to maintain any of the social functions of her job," Mixen testified: "[n]ot that I'm aware of." (App. 744; Mixen Dep., 171:23-25). When asked why the progressive discipline policy was not followed with Bolderson, Mixen could not explain why McDowell "wouldn't have followed that process." (App. 742; Mixen Dep., 169:3-12).

H.    Plaintiff's Complaints Resulted in Her Termination

On May 10, 2013, only four (4) days after Bolderson submitted her memorandum to Mayor Guccione and others regarding potential fraud and corruption in Wentzville, McDowell terminated her. (App. 727-38, 905-06; Mixen Dep., 154:23-165:16; Guccione Dep., 122:23-123:13). Bolderson was not initially provided with any reason for her termination. (App. 174-75; Bolderson Dep., 102:8-12). Defendant eventually sent a termination letter to Bolderson, in which it admitted she was terminated because of her written reports that Wentzville, and/or its appointed and elected officials, had engaged in potentially illegal conduct. (App. 1201-02).

McDowell drafted Plaintiff's termination letter and outlined the reasons why Wentzville terminated Plaintiff. (App. 1201-02). McDowell stated, in relevant part, Bolderson "engaged in written criticism of the Board of Aldermen's decisions for which [she had] no responsibility in [her] position," "used City work time and

13

equipment to engage in activities not properly within [her] job responsibilities," and "fail[ed] to follow the proper chain of command and…fail[ed] to adhere to the established protocols for providing advice to upper level managers through whom you are to report." (App. 1201-02).

McDowell was the sole decision maker with regard to Bolderson's termination. (App. 740; Mixen Dep., 167:2-17). Wentzville normally used progressive discipline prior to terminating an employee; progressive discipline allows an employee to correct what he or she was doing wrong and gives him or her an opportunity to get back on track. (App. 1382-84, 626, 889; Lee Dep., 41:19-43:1; Mixen Dep., 53:8-12; Guccione Dep., 106:20-23). McDowell terminated Plaintiff instead of placing her on a performance evaluation plan. (App. 904; Guccione Dep., 121:1-4).

I.      Plaintiff's Complaints Caused No Disruption in Defendant's Operations

Plaintiff's direct supervisor—Forebeck—could not point to any specific examples of Plaintiff burning a bridge or negatively influencing other employees. (App. 560; Forebeck Dep., 183:1-25). Forebeck testified it was possible morale was low in Wentzville due to the high employee turnover rate. (App. 561; Forebeck Dep., 184:1-4). Hitchcock testified it was common knowledge that a "hit list" existed in Wentzville. (App. 1044-45; Hitchcock Dep., 82:20-83-22). This

14

"hit list" contributed to employees being fearful of losing their jobs and contributed to low morale. (App. 1044-45; Hitchcock Dep., 82:20-83-22).

Similarly, Bolderson references this "hit list" in an email to Wentzville's Human Resources Director, Mixen, prior to Bolderson's termination. (App. 1107). On March 13, 2013, Bolderson e-mailed her superiors regarding concerns she had regarding: continuing to face false accusations by Wentzville aldermen because she previously reported ethical violations, protecting employees who report ethical violations from retaliation, and Wentzville officials' practice of maintaining a "hit list" of employees not favored by them who would be subject to termination in order to provide raises to other employees. (App. 1107).

Despite Plaintiff's complaints, Wentzville could not point to any specific examples of Bolderson being disruptive at work. (App. 561, 1467, 693-99; Forebeck Dep., 184:8-12; Lee Dep., 126:12-18; Mixen Dep., 120:22-126:9). Mixen testified no one with Wentzville lodged any complaints about Plaintiff's actions or conduct between January and May 10, 2013. (App. 740; Mixen Dep., 167:9-14). Beyond general reference to McDowell's termination letter, Mixen could not point to any specific incident or reason justifying Plaintiff's termination. (App. 742; Mixen Dep., 169:21-23). Mayor Guccione only works part-time and does not involve himself in issues among city personnel; instead, Mayor Guccione

15

relies on the City Administrator's judgment in his personnel decisions, including terminations. (App. 799, 924; Guccione Dep., 16:8-14, 141:5-23).

Mayor Guccione signed Plaintiff's May 10, 2013 termination letter, but does not recall if he personally wrote it or if it was prepared by the City Attorney. (App. 799; Guccione Dep., 16:8-14). Wentzville's City Attorney and Mayor Guccione both admitted that they did not investigate Bolderson's complaints prior to her termination. (App. 744-45, 799; Mixen Dep., 170:22-171:12; Guccione Dep., 16:8-14).

Appellate Case: 15-3846    Page: 24    Date Filed: 02/02/2016 Entry ID: 4362766

## SUMMARY OF THE ARGUMENT

The District Court erred in concluding no genuine issue of material fact exists concerning Bolderson's retaliation claim under 42 U.S.C. § 1983. In reaching this conclusion, the District Court: (1) failed to properly consider and construe substantial record evidence; and (2) misconstrued applicable legal standards throughout its analysis. Specifically, the District Court's order appears to have ignored the summary judgment standard of review by omitting any reference thereto and arbitrarily focusing on record evidence in a light favorable to Defendant. In addition, the District Court's inconsistent analysis of the speech in question and its misapplication of legal standards for determining job duties and the applicability of the *Pickering* test constitute reversible error.

In sum, the District Court's order overlooked and/or disregarded substantial questions of fact and law, warranting reversal by this Court.

Appellate Case: 15-3846    Page: 25    Date Filed: 02/02/2016 Entry ID: 4362766

**ARGUMENT**

I.  THE DISTRICT COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON BOLDERSON'S FIRST AMENDMENT CLAIM BECAUSE IT FAILED TO PROPERLY CONSIDER AND CONSTRUE RECORD EVIDENCE AS REQUIRED BY THE SUMMARY JUDGMENT STANDARD OF REVIEW.

A.  <u>Standard of Review</u>.

This Court reviews a grant of summary judgment *de novo*, applying the same standard as the District Court. *Evergreen Inv., LLC v. FCL Graphics, Inc.*, 334 F.3d 750, 753 (8th Cir. 2003).

Rule 56(c) provides that a motion for summary judgment shall be granted only if "there is no genuine issue as to any material fact and…the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A genuine issue of material facts exists where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When considering a motion for summary judgment, the Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, **in the light most favorable to the non-moving party**. *Medtronic, Inc. v. U.S. Xpress, Inc.*, 341 F.3d 798, 800 (8th Cir. 2003) (emphasis added).  The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in

Appellate Case: 15-3846     Page: 26     Date Filed: 02/02/2016 Entry ID: 4362766

the record that create a genuine issue for trial. *Medtronic*, 341 F.3d at 800. The Court is required to resolve all conflicts of evidence in favor of the non-moving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

      B.    <u>The District Court Erred By Failing To Construe Evidence In A Light Favorable To Bolderson And By Ignoring Substantial Record Evidence Creating Genuine Issues Of Material Fact As To Whether Bolderson Spoke As A Private Citizen On Matters Of Public Concern.</u>

The District Court held Bolderson spoke on matters of public concern, but did so as a public employee pursuant to her official job duties—not as a private citizen. (App. 1752-56). The District Court therefore concluded Bolderson's speech was not subject to First Amendment protection. (App. 1755-56). However, in reaching this conclusion, the District Court wholly ignored substantial record evidence—including Defendant's own admissions—demonstrating (or, at the very least, creating a genuine issue of material fact as to whether) Bolderson's speech was made as a private citizen. The District Court's failure to consider, and accord appropriate weight to, material record evidence constitutes reversible error.

Section 1983 provides a private right of action for individual citizens whose federal rights are violated by state and local governments and officials under color of the law. 42 U.S.C. § 1983. Among those rights protected by § 1983 is the First Amendment right to free speech. *See id.* "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters

19

of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). A citizen's right to free speech is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979). The First Amendment will protect "expressions related to the speaker's job." *Id.*

To plead a prima facie case of First Amendment retaliation, the plaintiff must allege: (1) she engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against her; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action. *Lyons v. Vaught,* 781 F.3d 958, 961 (8th Cir. 2015). If Plaintiff meets her burden, Defendant must "demonstrate that the same employment action would have been taken in the absence of the protected activity." *Id.*

The Court applies a two-step analysis to determine whether a plaintiff's speech is protected. *McCullough v. Univ. of Arkansas for Med. Sci.,* 559 F.3d 855, 865-66 (8th Cir. 2009). The first inquiry is whether the employee speaks as a citizen on a matter of public concern. *Anzaldua v. Northeast Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833 (8th Cir. 2015). If the employee speaks as a citizen on a matter of public concern, then the possibility of a First Amendment claim arises. *Id.* The second inquiry is whether the employer "has produced evidence to

20

indicate the speech had an adverse impact on the efficiency of the [employer's] operations." *Lindsey v. City of Orrick, Missouri*, 491 F.3d 892, 900 (8th Cir. 2007).

If the employer proves a sufficient adverse impact, then courts proceed to the *Pickering* balancing test, which balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 411.

### i. The District Court Ignored Substantial Record Evidence Demonstrating Bolderson Spoke As A Private Citizen.

The District Court erred in analyzing whether Bolderson reported her concerns pursuant to her official duties. The District Court concluded Bolderson's speech was not protected because it found she reported her concerns pursuant to her official duties as a public employee. (App. 1755-56). The District Court, however, wholly ignored critical and substantial record evidence in reaching this conclusion.

In *Garcetti*, the Supreme Court held "when public employees make statements *pursuant to their official duties*, the employees are not speaking as

21

citizens for First Amendment purposes." 547 U.S. at 421. The Court did not address the factual question of whether the individual in question made statements pursuant to his official job duties because the parties agreed he did. *Id*. at 424. However, the Court emphasized "the proper inquiry is a practical one" and rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." *Id*. The Court explained:

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id*. at 425.

The Supreme Court recently clarified speech does not lose First Amendment protection because it relates to the individual's employment, or concerns information learned by the individual through his or her employment. *See Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014). The Court explained:

> …the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is **whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties**.

*Lane*, 134 S. Ct. at 2379 (emphasis added). The Eighth Circuit has not adopted a specific analytical framework for determining whether an employee's speech was made pursuant to the employee's official job duties. However, the Ninth Circuit

22

recently set forth "guiding principles" based on "existing case law and common sense" in *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013).

The *Dahlia* Court explained: "…after *Garcetti* the inquiry into the protected status of speech presents a mixed question of fact and law, and specifically that the question of the scope and content of a plaintiff's job responsibilities is a question of fact." *Dahlia*, 735 F.3d at 1072. Noting the "fact-intensive nature of the inquiry," the *Dahlia* Court set forth three factors to consider: (1) whether the employee followed the chain of command (especially in law enforcement context); (2) the whether the subject matter of the speech concerns corruption or systemic abuse; and (3) whether the employee spoke in contravention to his supervisor's orders. *Id.* at 1074-75.

The Court clarified, under the first factor, "it is not dispositive that a public employee's statements are made internally." *Id.* at 1074. Under the second factor, the only exception occurs "when the employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit." *Id.* at 1075. Finally, under the third factor, "the fact that an employee is threatened or harassed by his superiors for engaging in a

23

particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties." *Id*. at 1076.[2]

> a. *The District Court Improperly Disregarded Critical Record Evidence Demonstrating Bolderson Did Not Report Potential Fraud And Corruption Pursuant To Her Official Job Duties.*

The Eighth Circuit has acknowledged the "proper inquiry" is a fact-specific, practical analysis as to whether certain speech was actually made pursuant to an employee's official job duties. *Lindsey*, 491 F.3d at 898-900; *see also Dahlia*, 735 F.3d at 1071 (overruling previous Court of Appeals decision for improper reliance on generic job description and failure to conduct fact-specific inquiry required by *Garcetti*).

In *Lindsey*, the city's public works director—Lindsey—alleged the city terminated him after he complained, at public city council meetings and in private discussions with city officials, about the city violating Missouri's Sunshine Law by improperly entering into closed executive session to discuss certain matters. *Id*. at 898. Lindsey's official job duties included attending and presenting reports at city council meetings, and the city trained Lindsey on Sunshine Law by paying for her

---

[2] The Tenth Circuit has adopted a similar framework as the Ninth Circuit. *Reinhardt v. Albuquerque Public Schools Bd. of Educ.*, 595 F.3d 1126, 1135-36 (10th Cir. 2010). Two factors suggest an employee spoke as a private citizen: "(1) the employee's job responsibilities did not relate to reporting wrongdoing and (2) the employee went outside the chain of command when reporting the wrongdoing." *Id*. at 1136.

Appellate Case: 15-3846    Page: 32    Date Filed: 02/02/2016 Entry ID: 4362766

to attend a seminar thereon. *Id*.  After attending this seminar, Lindsey "became convinced" the city was violating Sunshine Law and thereafter reported his concerns at a city council meeting. *Id.* at 896.

However, the Court found the record lacked specific evidence Lindsey's actual job duties included Sunshine Law compliance (*i.e.*, the substance of his speech). *Id*. at 898.  The Court concluded Lindsey's speech to the city council and officials was as a citizen—not a public employee—because reporting potential non-compliance with Sunshine Laws was not specifically one of Lindsey's official job duties. *Id*. at 898-900 (further noting "speech need not be in a public forum to be protected, especially when the speech is made to a public official about her conduct").

Here, **the District Court completely failed to address or consider Defendant's clear-cut, dispositive admissions that Defendant terminated Plaintiff for <u>engaging in written criticism of the Board outside the scope of her job duties</u>.**  In McDowell's May 10, 2013 termination letter, Defendant stated Bolderson, by sending her April 22, 2013 Memo and May 6, 2013 Memo:

> …engaged in written criticism of the Board of Aldermen's decisions for which [Bolderson had] no responsibility in [her] position…

> …fail[ed] to follow the proper chain of command…

> …fail[ed] to adhere to the established protocols for providing advice to upper level managers through whom you are to report…

25

> …used City work time and equipment to engage in activities not properly within your job responsibilities…

(App. 1201-02). Defendant terminated Bolderson for acting outside of the scope of her official job duties in sending the April 22, 2013 Memo and May 6, 2013 Memo to city officials; Defendant cannot *post hoc* deny the same. Moreover, Bolderson testified she wrote the May 6, 2013 memo in her capacity as a citizen: violations of Sunshine Law and misuse of taxpayer money (*i.e.*, the substance of her speech) had nothing to do with her position as Building Commissioner. (App. 293; Bolderson Dep. 221:5-22). The District Court erred by failing to consider Wentzville's admissions in analyzing whether Bolderson spoke as a private citizen.

> b. *The District Court Ignored And Misconstrued Record Evidence On The Nature And Scope Of Bolderson's Official Job Duties In Concluding Such Duties Entailed An Affirmative Duty To Report Fraud And Corruption.*

The District Court improperly relied upon Wentzville's written job description to overgeneralize the scope of Plaintiff's duties in a manner inconsistent with relevant record evidence. (App. 1755); *see Garcetti*, 547 U.S. at 425. The District Court also overstated deposition testimony to broadly construe Bolderson's duties as encompassing any actions related to ensuring compliance with laws or regulations, including reporting fraud and corruption. (App. 1755-56). The District Court tellingly failed to cite to any record evidence suggesting

26

Bolderson's official job duties actually included "an affirmative duty to report fraud and corruption." (App. 1742-63).

The record evidence indicates Plaintiff wrote ordinances, adopted construction codes, ensured building plans are complete and public works projects have an engineer of record, and inspected new construction along with other persons and departments. (App. 1305-06; Plaintiff's Dep., 87:14-21, 124:10-19). Bolderson's job duties did not involve reporting potential corruption or fraud. (App. 1305-06). Bolderson expressed concerns that Gartenberg's lack of licensure would impact the Project's progression and/or compliance; however, in light of the whole record, delay of and/or compliance issues with the Project were merely symptoms of what Bolderson saw as the root problem: corruption and self-dealing in Wentzville. *See, e.g.*, *Lindsey*, 491 F.3d at 899 (recognizing the main "thrust" of the speech was criticism of the city's practices, though it related to plaintiff's job). Common sense and the record evidence demonstrate Bolderson reported her concerns about potential fraud and corruption as a private citizen because her official and regular job duties did not involve reporting or investigating fraud or corruption.

Courts routinely deny summary judgment where an employee reports corruption related to, but extending beyond, the employee's official job duties and functions. *Greisen v. Hanken*, 2015 WL 9484479 at *2-6 (D. Ore. Dec. 29, 2015)

27

(denying summary judgment because police chief's speech addressed "broad concerns about corruption" outside of his official duties by questioning the propriety of city manager's handling of invoices, even though police chief's job duties included managing the department budget and submitting invoices to the city manager); *Dillon v. Suffolk County Dept. of Health Services*, 917 F. Supp. 2d 196, 208-13 (E.D.N.Y. 2013) (denying summary judgment because prison physician's speech addressed "corruption extending outside of her own personal duties" by reporting widespread inadequate treatment of prisoners, even though prison physician's "job duties included the general medical treatment" of prisoners); *Montgomery v. Board of County Comm'rs of Douglas County*, 637 F. Supp. 2d 934, 941-42 (D. Col. 2009) (denying summary judgment because coroner's speech addressed "improper conflict of interest" outside of his official duties by questioning supervisors about their improper handling of money on the job, even though coroner's job duties included "mak[ing] recommendations for budgeting and expenditures" to supervisors).

The District Court tellingly failed to cite to any record evidence to support its factual conclusion "Plaintiff had an affirmative duty [as part of her official job duties] to report fraud and corruption, and she had been specifically instructed by McDowell to file such a report if she believed ethical violations had been committed." (App. 1755). The reason for this omission is obvious: the record

28

evidence does not support the District Court's finding that McDowell ordered or instructed Bolderson to report fraud, corruption, or ethical violations. At best, in one administrative memorandum, McDowell informed Bolderson about *how* she *may* report ethical violations *if* she believed they occurred. (App. 1120). This informational memorandum is not an order or instruction to report fraud, corruption or ethical violations, and certainly does not enlarge, or in any way impact, the scope of Bolderson's official job duties. (App. 1120).

The District Court's analysis as to whether the May 6, 2013 Memo and April 22, 2013 Memo raised issues which "fell within" Bolderson's official job duties is also flawed. The District Court completely disregarded the detailed allegations and context of Bolderson's May 6, 2013 Memo and April 22, 2013 Memo, which unambiguously pertained to potential fraud and corruption; instead, the District Court relied on one excerpt of ambiguous deposition testimony, taken out of context, to conclude reporting fraud and corruption fell within Bolderson's official job duties (*see* Section I(B)(i)(d) *infra*).

The content of the May 6, 2013 Memo indisputably raises issues that cannot reasonably be said to fall within Bolderson's official job duties or responsibilities. In the May 6, 2013 Memo, Bolderson indicated she was "tak[ing] a stand with [her] moral convictions guiding [her]." (App. 1185). "From [her] perspective [Wentzville's actions were] nothing short of stealing from the Community." (App.

29

1185-86). Bolderson noted in detail several issues suggesting Wentzville officials were unlawfully engaged in "self-dealing": misrepresentations to the Board regarding fault for overlooking the large amount of rock on site, misrepresentations to the Board about terminating PDS, misrepresentations by the Board about professional oversight and Sunshine Law compliance, misrepresentations by McDowell about Gartenberg, misrepresentations by Hillin about the scope of services to be provided by Gartenberg, and misrepresentations to the community about the need for Gartenberg's services. (App. 1181-87). Bolderson further encouraged the Mayor to assign someone who was actually responsible for investigating and reporting fraud and corruption. (App. 1181). Bolderson's official job duties did not require her to report on the issues of fraud and corruption raised in the May 6, 2013 Memo.

The District Court also ignored and misconstrued substantial parts of the record evidence in characterizing Bolderson's April 22, 2013 Memo as addressing only "whether Gartenberg had the necessary credentials to oversee the Splash Station project in compliance with building codes, regulations, and State law" and in concluding such issue "clearly falls within her job responsibilities." (App. 1755); *Snyder v. Phelps*, 562 U.S. 443, 444 (2011) ("[t]his Court must independently examine the 'content, form, and context,' of the speech, 'as revealed by the whole record'") (internal citations omitted).

Appellate Case: 15-3846    Page: 38    Date Filed: 02/02/2016 Entry ID: 4362766

Consideration of the record evidence as a whole clearly demonstrates the April 22, 2013 Memo was not just about "enforcing building codes." (App. 1177-79). Bolderson explained in the April 22, 2013 Memo she considered Wentzville's actions of (1) hastily hiring Gartenberg (who was not a licensed architect or engineer, as required for the Project) and (2) planning to rehire the previous subcontractors with whom Wentzville recently cancelled its contract in order to cure Gartenberg's lack of licensure, to have presented not only legal issues related to the Project's compliance with applicable regulations and statutes, but also a serious ethical issue about potential collusion involving Gartenberg:

> [Gartenberg] explained to me that he understood that the City was without a design engineer of record and that he planned for Wentzville to re-contract with Waters Edge [sic] and Jacobs to avoid a conflict with the approved plans. **Which brings me to the question: If we rehire the previous people that we worked with before, why is the City paying for Mr Gartenberg?** I asked him this question and he could not give me a decisive answer…
>
> …**If the City chooses to throw 100k away for "consultants", as was eluded to by Mr Gartenberg, they certainly may.** However, they may not hire consultants that will violate the law or put more of the public in jeopardy. This, in my mind, is **both an ethics issue and a legal issue.**
>
> Until I am further notified I will not approve of any change orders for this project until an engineer of record has been determined. My responsibility to the City is to protect the public safety and obey local, state, and Federal laws. **My professional ethics require that I report this issue to you so that it is resolved as soon as possible**.

31

(App. 1177-79) (emphases added). Properly understood in the factual context of this case (and in a light favorable to Bolderson), Bolderson's stated concerns unmistakably pertained to suspected collusion between McDowell and Gartenberg in hastily terminating PDS and contracting with Gartenberg where Gartenberg was not licensed and Wentzville rehired PDS's subcontractors to cure Gartenberg's lack of licensure. *See Snyder*, 562 U.S. at 444.

The District Court improperly dismissed Bolderson's concern about collusion as mere criticism "of the wisdom or ethics of selecting Gartenberg," concluding (without further citation to, or holistic consideration of, record evidence) that such a concern "does not alter that she was speaking as the public employee with primary responsibility for enforcing building codes." (App. 1755) (citing *Bailey*, 451 F.3d at 520). While Bolderson expressed concern about the ability of Wentzville to comply with the requirement of having an engineer on record (*i.e.*, a concern related to her job duties), Bolderson raised a separate, broader concern about potential collusion between Wentzville and Gartenberg via a rhetorical question: "If we rehire the previous people that we worked with before, why is the City paying for Mr. Gartenberg?"

32

c. *The District Court Lacked Any Basis In Law To Conclude The Record Evidence Established Bolderson Had An Affirmative Duty To Report Fraud And Corruption.*

The District Court's factual finding that Bolderson had "affirmative duty to report fraud and corruption" garners no support from the case law cited. The District Court cited *Livingston v. Bartis* in support of its claim Bolderson had an "affirmative duty to report fraud and corruption." 2008 WL 185791 at *7 (E.D. Mo. Jan. 18, 2008). *Bartis*, however, is factually distinguishable.

In *Bartis*, the Court addressed police officers' claims they were terminated due to complaints of misconduct they made to their superiors and the Federal Bureau of Investigation ("FBI"). *Id*. The Court analyzed the complaints separately to determine whether the police officers' complaints were made pursuant to their official job duties. *Id*. The police officers admitted they provided written reports about misconduct to their superiors **pursuant to orders from their superiors**. *Id*. (emphasis added). A departmental rule also required the officers to do so. *Id*. However, the departmental rules did not require the officers to report misconduct to the FBI, and their superiors did not order them to do so. *Id*. at *8. Evidence further suggested police officers in the department were expected *not* to make such reports. *Id*. (citing *Batt v. City of Oakland*, 2006 WL 1980401 at *4 (N.D. Cal. Jul. 13, 2006)). The *Bartis* court found the officers' statements *to their superiors* to have been made pursuant to their official duties because the officers were

33

specifically ordered to do so and a departmental rule required it. *Id*. at *7. However, the Court denied summary judgment in part because it found a genuine issue of material fact existed as to whether the police officers acted as citizens in reporting misconduct *to the FBI*. *Id*.

Here, unlike in *Bartis*, no one at Wentzville ordered Bolderson to report fraud or corruption. Bolderson's actual job duties did not entail or require reporting fraud or corruption. (App. 1305-06). *Bartis* does not lend factual support to the District Court's conclusion here that Bolderson had "an affirmative duty to report fraud and corruption" because Wentzville neither ordered nor had a rule requiring Bolderson to do so as part of her official job duties. Defendant's termination letter affirms Bolderson had no such responsibility.

General workplace rules encouraging or requiring reports of misconduct are insufficient to establish an employee acted pursuant to his official job duties in making such a report where the employee presents evidence workplace custom or culture discouraged such reports. *Batt*, 2006 WL 1980401 at *4; *Densmore v. City of Maywood*, 320 F. App'x 497, 499 (9th Cir. 2008) (reversing summary judgment in favor of defendant due to plaintiff's statement "there [was] a 'code of silence' operating within the department" wherein plaintiff "was not expected to report his fellow officers, but to cover up their misdeeds" even though the department had a written policy directing officers to report such misdeeds); *Paola v. Spada*, 498 F.

34

Supp. 2d 502, 509 (D. Conn. 2007) (denying summary judgment where defendant presented evidence plaintiff had a duty to report misconduct but plaintiff adduced "competing evidence" suggesting workplace culture was hostile to internal reporting of officer misconduct); *see also Barclay v. Michalsky*, 451 F. Supp. 2d 386, 395 (D. Conn. 2006) (denying summary judgment where defendant failed to demonstrate that reporting work rule violations, as called for by a written workplace policy, "was particularly within the province of plaintiff's professional duties").

In *Batt*, the court denied defendant's motion for summary judgment because a fact issue remained as to whether plaintiff's reports of misconduct were made pursuant to his official job duties. 2006 WL 1980401 at *4. The *Batt* plaintiff was a police trainee who observed several instances of misconduct by supervisors within the police department. *Id*. at *1-2. The police department had rules and regulations requiring reporting of misconduct. *Id.* at *4. Several officers, however, discouraged plaintiff from reporting what he observed. *Id*. at *1-2. Evidence suggested "[the police department] had a general culture of punishing officers who reported misconduct." *Id*. at *2.

The defendant argued plaintiff acted pursuant to his official duties when he reported misconduct, as required by departmental rules and regulations. *Id*. at *1-4. The Court rejected this argument, finding evidence on the department's "general

35

culture" to create a genuine issue of material fact as to whether plaintiff's reports were made pursuant to his official job duties:

> The central premise of plaintiff's case is that notwithstanding any official policy of the [police department], the culture of the [police department] and the express commands of his direct supervisors established that plaintiff had a duty *not* to report misconduct. Plaintiff has offered a variety of evidence in support of his claim, including plaintiff's experiences at the academy, his interaction with his superiors, his interaction with his peers following his report to internal affairs, and the testimony of Chief Word that plaintiff's career would have been impaired as a result of his report. Thus a fact issue remains as to whether plaintiff's speech was protected under the First Amendment.

*Id*. at *4. In other words, the *Batt* court properly rejected the "form over substance" approach advocated by the police department because "an employer's articulation of a 'duty,' without more, does not eliminate any obligation to comply with the First Amendment." *Id*. Instead, the *Batt* court emphasized it "must determine whether the employee is 'actually expected to perform' the potentially protected act." *Id*. The *Batt* court held the police department's "official policy" of mandatory reporting was insufficient to establish plaintiff complained pursuant to his job duties because evidence suggested the department was hostile to such reports. *See id*.

Here, like *Batt*, the record contains evidence suggesting workplace custom or culture at Wentzville actively discouraged such reports and employees (including Bolderson) constantly feared retaliation for disagreeing with superiors.

36

(App. 1044-15, 1107). On March 13, 2013, Bolderson e-mailed her superiors regarding concerns she had regarding: continuing to face false accusations by Wentzville aldermen because she previously reported ethical violations, protecting employees who report ethical violations from retaliation, and Wentzville officials' practice of maintaining a "hit list" of employees not favored by them who would be subject to termination in order to provide raises to other employees. (App. 1107). Hitchcock—another Wentzville employee—also confirmed his awareness of Wentzville officials' custom of keeping a "hit list" of employees that officials wanted to potentially terminate. (App. 1044-45; Hitchcock Dep., 82:20-83-22). Wentzville employees generally knew of this "hit list" and, in light of it, were constantly fearful of losing their jobs in the event a superior did not "want" them there. (App. 1044-45). Even if Bolderson had a "general duty" to report her concerns of potential fraud and corruption (she did not), record evidence on the customs and culture at Wentzville create a genuine issue of material fact whether Bolderson's speech was made pursuant to her official duties.

> d. *The District Court's Finding That Bolderson Admitted She Reported Corruption Pursuant To Her Official Job Duties Wholly Ignores The Record Evidence And The Applicable Standard of Review.*

The District Court improperly construed an excerpt from Bolderson's deposition testimony as an "admission…that her [May 6, 2013 Memo] was prepared pursuant to her official duties." (App. 1756). The District Court

observed: "[i]ndeed, plaintiff testified at deposition that she considered it her 'duty [both] as building commissioner and as a citizen' to speak up about these issues." (App. 1756). However, at deposition, Bolderson explained:

> Q: Okay. Did you view it as your duty as the building commissioner to make these fraud and corruption allegations?
>
> A: It was both as my duty as a building commissioner **and** as a citizen.
>
> Q: Okay.
>
> A: **Because some of these issues in this memo, just like in here, would have to do with taxes and things, wastes of money, had nothing to do with my position**.
>
> ….
>
> Q: But you didn't feel like you had the option not to report it, correct?
>
> A: I didn't feel that I didn't have the option to do so. **I believe every employee and every citizen has the obligation to report wrongdoing**…
>
> Q: Okay.
>
> A: …**if they see it happening**.

(App. 169-171; Bolderson Dep. 97:22-98:6, 99:3-7) (emphases added). Bolderson conveyed she felt obligated as a citizen to report matters of public concern, such as waste of taxpayer money. The fact Bolderson learned about potential fraud and corruption while employed as Building Commissioner does not establish, or constitute an admission, she made her reports pursuant to her official job duties *qua* Building Commissioner. *Lane*, 134 S. Ct. at 2378; *Lindsey*, 491 F.3d at 899.

38

Properly understood in context (and in a light favorable to the non-movant), Bolderson's testimony focuses on a general "duty" to report wrongdoing *when it is witnessed by any individual*–regardless of that individual's status (*e.g.*, employee, citizen) or particular job duties. At the very least, this testimony creates a genuine issue of material fact as to the capacity in which Bolderson spoke due its conjunctive construction. The District Court's selective focus on limited excerpts of testimony (in a light favorable to Defendant) is improper as matter of fact and law at summary judgment.

> e. *The District Court Lacked Any Basis In Law To Conclude Bolderson Admitted She Reported Corruption And Fraud Pursuant To Her Official Job Duties.*

The District Court's finding that Bolderson admitted she spoke pursuant to her official job duties also does not garner support from the cases cited. The District Court cited *Bailey v. Dep't of Elem. & Secondary Educ.,* 451 F.3d 514, 520 (8th Cir. 2006) and *Bonn v. City of Omaha*, 623 F.3d 587, 592 (8th Cir. 2010) in support of its finding. *Bailey* and *Bonn*, however, offer no support because they are factually inapposite.

In *Bailey*, the plaintiff—Bailey—served provided consultation services to the defendant—Department of Elementary and Secondary Education ("DESE"). Bailey had a documented history of disciplinary issues and conflicts with co-workers. *Id.* at 517. Bailey wrote a letter to one of his supervisors—Ronald

39

Vessell ("Vessell")—to make "an official complaint in regards to…Scully." 451 F.3d at 517. Neil Scully ("Scully") was also one of Bailey's supervisors. *Id*. at 520. Scully had forwarded complaints about Bailey to Vessell and also had previous disagreements with Bailey. *Id*. at 517. Bailey's letter to Vessell focused almost exclusively upon his conflicts with Scully. *Id*. at 520.

The Court analyzed the letter to determine whether Bailey addressed matters of public concern. *Id*. The Court noted the letter primarily focused on Scully, even though it vaguely mentioned matters of public concern. *Id*. However, "perhaps most importantly," the Court observed, "**Bailey's letter concluded with the statement, 'I consider any time I spend addressing this matter with you or the agency to be services I am giving the state as a consultant**.'" *Id*. (emphasis added). Under *Garcetti*, the Court concluded such speech was not protected because this statement alone demonstrated "Bailey was not acting as a concerned public citizen, but as an employee concerned with being paid for his time." *Id*.

In *Bonn*, the plaintiff—Bonn—served as public safety auditor for defendant—City of Omaha. 623 F.3d at 587. As part of her official duties, Bonn prepared and published a report on traffic stops. *Id*. at 589. The Mayor did not have the opportunity to review the final version of the report prior to publication. *Id*. The Mayor thereafter terminated Bonn, explaining Bonn's action of publishing the report without notice to the Mayor constituted insubordination. *Id*. The district

40

court granted summary judgment against Bonn because, *inter alia*, the statements in her report were not protected by the First Amendment. *Id.*

The Eighth Circuit affirmed the district court, finding statements in Bonn's report not protected because Bonn admitted they were made pursuant to her official job duties. *Id.* at 592-93. The Eighth Circuit emphasized Bonn's response to an interrogatory, wherein she unambiguously admitted her report was "**prepared as a function or official duty of [her] position as the Public Safety Auditor of the City of Omaha**." *Id.* Given the absence of any dispute on this issue, summary judgment was appropriate. *Id.*

Here, unlike the unambiguous admissions in *Bailey* and *Bonn*, neither the May 6, 2013 Memo nor the April 22, 2013 Memo contains an admission that Bolderson reported her concerns about potential fraud and corruption pursuant to her official job duties. Moreover, Bolderson's ambiguous deposition testimony indicates she broadly viewed her corruption concerns as relating to her "duty" as a private citizen and an employee—**not that reporting corruption was one of her official job duties as Building Commissioner or that she raised fraud and corruption allegations pursuant to her official job duties**. Ambiguous deposition testimony, removed from context, does not eliminate the genuine issue of material fact under the circumstances as to whether Bolderson reported potential corruption or fraud pursuant to her official job duties. Here, when viewed as a

41

whole and in a light favorable to Bolderson, the record evidence demonstrates Bolderson spoke outside her official job duties in reporting concerns about potential collusion between Wentzville and Gartenberg. The District Court's reliance on *Bailey* and *Bonn* is unavailing.

C. The District Court Erred By Misconstruing The Applicable Legal Standard And The Record Evidence In Addressing Whether The *Pickering* Test Applies.

i. **The District Court Erroneously Held Defendant Need Not, As A Matter Of Law, Produce Evidence Of Actual Disruption Caused By Protected Speech Before Applying The *Pickering* Test.**

The District Court held, as a matter of law, Defendant need not produce evidence of actual disruption in the workplace before applying the *Pickering* test. (App. 1757). The District Court cited *Anzaldua* in support:

> [e]vidence of actual disruption . . . is not required **in all cases**. This is because we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

*Anzaldua,* 793 F.3d at 833-34 (emphasis added).

Eighth Circuit case law, however, is clear: "[t]o trigger the *Pickering* balancing test, a public employer must, **with specificity**, **demonstrate the speech at issue** created workplace disharmony, impeded the plaintiff's performance or impaired working relationships." *See Lindsey*, 491 F.3d at 900 (citing *Washington v. Normandy Fire Prot. Dist.*, 272 F.3d 522, 527 (8th Cir. 2001)) (emphasis

42

added).  "Mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." *Id.*  The relevant inquiry is solely **whether the protected speech in question**—not other alleged speech or conduct—**disrupted operations**. *Lindsey*, 491 F.3d at 901 (noting "[a]s an initial matter, we find Lindsey's taping of two public Council meetings irrelevant to our inquiry, as this was not his alleged protected speech"); *see also Hemminghaus v. Missouri*, 2013 WL 588197, at *9 (E.D. Mo. Feb. 13, 2013) ("before *Pickering* can be put at issue at all, a public employer must put forth evidence that the speech in question had an adverse impact on the efficiency of the employer's operations").

The District Court erred by suggesting evidence of actual disruption in the workplace is never required in order to apply the *Pickering* test.  However, reading *Anzaldua* together with the legal standard set forth by this Circuit in *Lindsey*, *Belk* and other decisions suggests evidence of actual disruption is required as a general rule before applying *Pickering*, but may not be required in a particular case because a rigid rule mandating evidence of the "destruction of working relationships…before taking action," without exception, would prejudice public operations. *See Anzaldua,* 793 F.3d at 833-34; *Belk v. City of Eldon*, 228 F.3d 872, 882 (8th Cir. 2000) ("[i]n cases where the public employer cannot demonstrate that the employee's speech disrupted the workplace, however, the court need not proceed to a specific *Pickering* factor analysis **absent exceptional**

43

**circumstances**") (emphasis added). Notwithstanding exceptions to the general rule, this Circuit has explained the rationale for requiring a showing of actual disruption before applying *Pickering*:

> Absent [an evidentiary showing of an actual adverse impact], 'there are no government interests in efficiency to weigh against First Amendment interests' and we need not engage in the *Pickering* balancing test.

*Lindsey*, 491 F.3d at 900; *see also Belk*, 228 F.3d at 882. The District Court failed to address or explain "exceptional circumstances" justifying deviation from the general rule adopted in this Circuit.

> ### ii. The District Court Misconstrued Record Evidence In Concluding Bolderson's Speech Caused Actual Disruption.

The District Court misconstrued the record evidence in a false light solely favorable to Defendant. The District Court held "the record contains ample evidence of actual disruption," citing to excerpts from Forebeck's deposition, Lee's deposition, and the termination letter of Bolderson drafted by McDowell. (App. 1757-60). As a threshold matter, none of the record evidence cited by the District Court supports the conclusion the April 22, 2013 Memo and May 6, 2013 Memo (*i.e.*, the protected speech at issue) specifically caused actual or potential disruption. Moreover, even assuming *arguendo* the evidence cited by the District Court causally relates to the protected speech at issue (it does not), none of the

44

cited evidence eliminates the genuine issue of material fact as to whether such evidence shows actual disruption existed under the circumstances.

First, the District Court improperly relied on a limited excerpt of Forebeck's testimony, unfairly removed from context in a manner unmistakably prejudicial to Bolderson. The District Court stated: "Plaintiff's supervisor Forebeck testified that her 'tendency to be very black and white,' as exemplified in the April 22nd and May 6th communications, created additional work and was a hindrance to operations.' [sic]" (App. 1757). Not only did the District Court misquote the deposition testimony, it completely misrepresented its context:

> Q: Could you give an example of what you are really talking about on strict compliance with the code versus helping a project to get through to completion and maybe what she was doing versus what you would have like [sic] to see an ideal person in her role doing?
>
> A: **I'm not prepared today to give a specific example**, **it was just overarching**.
>
> Q: It **doesn't have to be a specific example** of something that happened, but even a theoretical example of how she might handle a situation that you would of –
>
> [Plaintiff's Counsel]: **I'm going to object as speculative. He kind of stated he's not prepared to talk about these issues.**
>
> A: Overall message I was trying to deliver is we would be open to alternatives that were available under the code and not closing the door to customers and their ideas or, you know, downtown buildings and their ADA compliance, I know there are specific requirements and that's fine. So maybe that's a poor example,

45

but **there was just a tendency** to be very black and white in the administration of the duties. **And as you got later on in the period, it started to improve and be just a little more open to alternatives and how to help people to be successful in building a new structure for additions or remodels, et cetera**.

Q:   Did you feel that she would sometimes unnecessarily act as a roadblock for legitimate projects?

A:   Um, **roadblock might be a strong term**, but certainly adding work, review, administrative duties, re-review, e-mail traffic, so **somewhat of a hinderance** [sic] just to smooth the department operations, I think is how I would term that.

(App. 547-48; Forebeck Dep. 170:1-171:12).  This testimony does not mention, or even relate to, actual or potential disruption caused by the protected speech at issue (*i.e.*, the April 22, 2013 Memo or the May 6, 2013 Memo).  Forebeck provided the above-quoted deposition testimony **in the context of discussing a performance evaluation he gave Bolderson in 2012**—not in reference to the April 22, 2013 Memo and May 6, 2013 Memo, as stated by the District Court. (App. 544-48; Forebeck Dep. 167:24-171:12).  This testimony is irrelevant as a matter of law and cannot support a finding of disruption. *Lindsey*, 491 F.3d at 901.

Under Eighth Circuit case law, Forebeck's non-specific testimony (to which Plaintiff's counsel appropriately objected) is grossly insufficient to constitute the specific evidence necessary to fulfill the *Pickering* test's threshold requirement of disruption. *See Lindsey*, 491 F.3d at 900-01 (holding evidence on disputes and conflicts between plaintiff and defendant, paired with conclusory statements about

46

the effects thereof on operations, to be insufficient to demonstrate disruption); *Sexton v. Martin*, 210 F.3d 905, 911-12 (8th Cir. 2000) (holding defendant's affidavit and deposition testimony from city administrator, without further supporting evidence, insufficient to establish disruption because "vague and conclusory statements do not demonstrate with any specificity that the speech" actually caused disruption); *Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389, 397-98 (8th Cir. 1995) (holding conclusory statements that plaintiff's speech disrupted the workplace and caused inefficiency in government services insufficient to establish disruption).

The District Court further improperly relied on vague and conclusory deposition testimony provided by Lee as "ample evidence of actual disruption." The District Court stated:

> Doug Lee testified that plaintiff's dissatisfaction over the Splash Project created a 'negative atmosphere' that 'impede[d] staff's ability to function in the field,' was detrimental to productivity, caused tension between the staff across departments, and called into question what the City was doing with the Splash Station.

(App. 1757). However, the deposition testimony cited by the District Court does not provide support for its conclusion. It reads, in full context:

> Q:   All right. Mr. Lee, Miss Bolderson admitted at her deposition during Mike McDowell's administration she would speak with Scott Hitchcock daily to discuss and compare notes regarding their various suspicions of impropriety on projects they were collaborating on?

Appellate Case: 15-3846   Page: 55   Date Filed: 02/02/2016 Entry ID: 4362766

[Plaintiff's Counsel]: **I'm going to object to the extent it mischaracterizes Miss Bolderson's testimony. She did testify that her and Mr. Hitchcock did collaborate as part of their official job duties within the City of Wentzville.**

Q:    (By [Defendant's Counsel]) Did you know that this was going on with one of your subordinates?

A:    **I thought he was having conversations with her**, yes.

Q:    Did you know that it was happening daily?

A:    **I didn't know it was that much, no**.

Q:    Did you know that they were –

[Plaintiff's Counsel]: **Objection, assumes facts that are not in evidence. Subject to that, you can answer**.

Q:    (By [Defendant's Counsel]) Did you know that they were regularly talking about their suspicions of impropriety?

A:    **I thought they possibly were**, yes.

Q:    Do you believe that these activities impaired the efficient operations of the community development department and public works department?

A:    **Yes**.

Q:    Do you believe these ongoing activities between Mrs. Bolderson and Mr. Hitchcock were disruptive to the work place?

A:    **Yes**.

48

Q: Can you explain to me how you observed these to be disruptive?

A: **I think the negative atmosphere that seemed to impede staffs [sic] ability to function in the field**. It just kind of questioned what we are doing with the project.

Q: Was it detrimental to productivity?

A: **Yes, I think it was**.

Q: Did it promote harmonious relations among the City staff?

A: **No**.

Q: Did it have the opposite effect?

A: **Yes**.

Q: Did it cause a tension between staff at various levels among the two different departments?

A: **Yes**.

Q: You stated that appropriate channels should be used to communicate with the mayor regarding various concerns; is that correct?

A: **Yes**.

Q: And do you believe that observing the chain of command promotes efficient operations of the City with regard to communicating concerns?

A: **Yes**.

Q: And do you believe that circumventing the chain of command impairs the efficient operation of the City?

A: **I believe it can**, yes.

49

Q:     Can you explain why you believe that in practice circumventing the chain of command regarding concerns s [sic] would impair the efficient operations of the City?

[Plaintiff's Counsel]:     **I'm going to object, this is speculative**.

Q:     (By [Defendant's Counsel])  Based on your own experience?

A:     Yes, **I believe if you had 200 employees reporting directly their issues or concerns to the mayor that could supercede [sic] or oversee the authority of their supervisor and impact productivity**.

(App. 1461-64; Doug Lee Dep. 120:22-123:19) (emphases added).  Lee's deposition testimony is not only directly controverted by Plaintiff's deposition testimony, but also does not show, or create any reasonable inference that, Plaintiff's April 22, 2013 Memo or May 6, 2013 Memo caused disruption at Wentzville. (App. 341; Bolderson Dep. 269:17-21).  The testimony relied upon by the District Court focuses on irrelevant and disputed speech between Bolderson and Hitchcock, and does not reference or relate to the protected speech at issue— the April 22, 2013 Memo and May 6, 2013 Memo. *Belk*, 228 F.3d at 882 (evidence defendant's city hall "had become a tumultuous place to work" was insufficient to trigger *Pickering* where there was no indication the speech at issue "was the cause of the tumult").  The vast majority of Lee's "testimony" involved "yes" or "no" responses to leading questions posed by Defendant's counsel.  Moreover, Lee couched the rest of his testimony in terms of uncorroborated beliefs, thoughts, or

Appellate Case: 15-3846     Page: 58     Date Filed: 02/02/2016 Entry ID: 4362766

hypotheticals. Eighth Circuit case law is clear these vague and conclusory statements of disruption are insufficient to trigger application of *Pickering*.

The District Court improperly relied on conclusory statements by McDowell in his termination letter to suggest Bolderson actually "disrupted day-to-day management operations." (App. 1757). McDowell wrote in his letter:

> You have become disruptive of the day to day management operations of the City, undermined the authority of the Board of Aldermen and the City Administrator, and damaged any ability to work with you as you advanced your personal views of official decisions with which you disagree.

(App. 1202). This statement does not identify the April 22, 2013 Memo or May 6, 2013 Memo as the cause(s) of the purported disruption, or otherwise specify *how* Bolderson's protected speech disrupted operations. Conclusory statements about disruption by an employer cannot constitute evidence of disruption, as a matter of fact or law.

D. To the Extent *Pickering* Applies, the District Court Erred By Ignoring And Misconstruing Substantial Record Evidence In Concluding Bolderson's Termination Was Justified.

The District Court determined the *Pickering* factors weighed in Defendant's favor. (App. 1758). The District Court based its determination on its finding Bolderson: (1) questioned the integrity of city employees without substantive evidence to support her suspicions; (2) engaged in acts of insubordination; (3) worked to halt the Gartenberg contract for no reason; and (4) engaged in activities

51

impairing her ability to perform her duties. (App. 1758-60). After purporting to weigh the *Pickering* factors, the District Court held Defendant did not terminate Bolderson in violation of her First Amendment rights. (App. 1760).

The District Court's analysis, however, is legally and factually flawed. The District Court ignored substantial record evidence indicating Bolderson's concerns were well-founded and involved the public interest. Instead, the District Court relied upon little more than speculation in concluding Bolderson's speech impaired her ability to perform her own duties or undermined Defendant's operations. The District Court further relied upon factually inapposite case law.

Under the *Pickering* test, courts consider several interrelated factors in balancing the competing interests of government-employer and citizen-employee. *See Belk v. City of Eldon,* 228 F.3d 872 (8th Cir. 2000). These factors may include: (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties. *Id.* This fact-specific balancing "requires full consideration of the government's interest in effective and efficient fulfillment of its responsibilities to

52

the public." *Id.* (citation omitted). "[T]he *Pickering* balance is flexible and the weight to be given to any factor varies depending on the circumstances of the case." *Anzaldua*, 793 F.3d at 835.

### i. The District Court Ignored Substantial Record Evidence Demonstrating Bolderson's Speech Was Well-Founded And Involved The Public Interest.

The District Court ignored and/or misconstrued substantial record evidence in concluding "plaintiff questioned the integrity of city employees without substantive evidence to support her suspicions." (App. 1759). The District Court ignored material facts about the circumstances surrounding the Project, including but not limited to:

(a) Defendant submitted its Request for Proposal ("RFP") on April 5, 2013—prior to official notification of the Board's intent to terminate PDS—and only allowed five (5) days for bid submissions, contrary to customary practice for projects of similar complexity (App. 1122-30, 1014);

(b) CCS submitted a cheaper bid (with a cap on costs) and provided the necessary licensed engineer of record, but Defendant—at the recommendation of McDowell—chose the more expensive bid from Gartenberg (*i.e.*, McDowell's business associate and former co-worker) who was not a licensed engineer of record (App. 1156, 1134);

(c) Defendant admitted Bolderson correctly recognized in her April 22, 2013 Memo that Gartenberg's lack of licensure could cause problems for the Project and its timely progression (App. 473-75; Forebeck Dep. 96:2-98:15)[3];

---

[3] Significantly, Bolderson notified Wentzville of this critical problem **prior to** Gartenberg reporting, on April 24, 2013, that he was (according to the District Court) "negotiating to reengage design engineers"—that is, trying to rehire the

(d)     In order to cure his lack of licensure, Gartenberg re-hired the same subcontractors PDS had used who had done the lion's share of the Project work (App. 1429-30, 1027-29; Lee Dep. 88:9-89:21, Hitchcock Dep., 65:16-67:16);

(e)     McDowell was the driving force at the April 10, 2013 Board meeting behind terminating PDS and hiring Gartenberg (App. 1134-35);

(f)     The Board never explained its precise reasons for terminating PDS (App. 1134-35);

(g)     Gartenberg's final contract was materially different than the initial proposal submitted to and accepted by the Board, in a manner in which Gartenberg could charge even more fees for his services (App. 1167-75);

(h)     Gartenberg's services ended up costing Wentzville almost double the estimated cost set forth in his initial proposal—that is, approximately $155,000 (App. 1029; Hitchcock Dep., 67:17-23);

(i)     The City Engineering Department was never consulted with respect to the termination of PDS and the hiring of Gartenberg, contrary to custom (App. 103-14; Hitchcock Dep., 51:4-52:16); and

(j)     Hitchcock was subsequently terminated for questioning the legitimacy of Gartenberg's invoices, which was also deemed "insubordination" by Defendant (App. 1060; Hitchcock Dep., 98:17-22).

This evidence directly controverts the "facts" cited by the District Court and its conclusion Bolderson was merely "acting to halt the Gartenberg contract" without "substantive evidence to support her suspicions." (App. 1758). Moreover, the

---

same subcontractors whom Wentzville had just effectively terminated along with PDS. (App. 1758). But for Bolderson's and Hitchcock's insight on this licensure issue, Wentzville would likely have unlawfully proceeded without a licensed engineer on the Project, as the issue was apparently not a concern in hiring Gartenberg.

54

District Court cited deposition testimony of Hitchcock to suggest "plaintiff used work time to communicate her suspicions to other employees." (App. 1758). However, the cited testimony actually indicates Bolderson and Hitchcock tried to address and resolve the lack of licensure issue caused by Gartenberg's hiring—not that Bolderson was using work time to undermine Wentzville officials' authority, as insinuated by the District Court. The District Court's disregard of the foregoing facts—supported by record evidence—and mischaracterization of record evidence underscores its concomitant failure to consider the record evidence as a whole and construe it in a light favorable to Bolderson.

### ii. The District Court Erroneously Relied Upon Factually Inapposite Legal Precedent In Concluding Bolderson Levelled Personal Attacks Without Substantive Evidence Of Her Concerns.

The District Court mistakenly relied upon *Smith v. Cleburne Cty. Hosp.*, 870 F.2d 1375, 1383 (8th Cir. 1989) to support its conclusion Bolderson leveled unfounded personal attacks on public officials. However, *Smith* offers no support because it is factually inapposite.

In *Smith*, the Eighth Circuit held some of plaintiff's speech did not address matters of public concern because plaintiff's criticisms "evolved [over a period of years] into statements of personal animosity against specific people." *Smith*, 870 F.2d at 1382. The plaintiff—a physician—alleged the defendant hospital terminated his medical privileges for speaking on matters of public concern. *Id.* at

55

1376.  The plaintiff criticized the hospital's quality of patient care and indicated he would resign from its staff if the hospital did not—in his opinion alone—conduct a satisfactory investigation. *Id.* at 1377.  The plaintiff found the hospital's response to his criticisms unsatisfactory and consequently launched a political campaign for a position (*i.e.*, County Judge) that would allow him to appoint the hospital's Board of Governors. *Id*. at 1378.

The plaintiff's criticisms, however, "became caustic personal attacks on almost every person connected with the Hospital ranging from the County Judge…to staff personnel." *Id.* at 1382. The plaintiff wrote a letter to the hospital's Board of Governors, comparing them to crooks, thieves, cheats and robbers. *Id.* at 1378.  The plaintiff shared this letter with his patients (whom he had begun to refer to other hospitals) and drafted yet another letter to their patients, explaining he was quitting "due to the lack of his expected level of patient care." *Id*. at 1377.  The plaintiff thereafter wrote personal letters to each member of the Board of Governors, calling for their resignations and leveling personal attacks on their character. *Id*.  The Court concluded the employee's public personal attacks were "a calculated effort to disrupt the efficiency of the Hospital" and constituted "economic coercion against the Hospital as a public institution."  *Id.* at 1383.

This case is wholly distinct from *Smith*.  Unlike the plaintiff in *Smith*, Bolderson did not disseminate allegations and personal attacks about Defendant to

Appellate Case: 15-3846     Page: 64     Date Filed: 02/02/2016 Entry ID: 4362766

the public at large as part of a political campaign to overtake or improperly harm Defendant's operations. Bolderson's speech, as reflected in her April 22, 2013 Memo and May 6, 2013 Memo to certain Wentzville officials, explained in detail the facts and circumstances leading her to reasonably believe some officials were unlawfully engaged in corrupt practices at the taxpayer's cost; it did not, like the letters in *Smith*, involve "caustic personal attacks" designed to achieve an individual political or economic end. Moreover, unlike the hospital in *Smith*, Defendant adduced no evidence of actual disruption caused by Bolderson's memoranda. The only "disruption" to the Project (*i.e.*, delay) resulted from Defendant's own actions in hastily hiring a new, more expensive contractor who could not provide necessary services.

The record evidence as a whole demonstrates Bolderson's concerns primarily touched upon fraud and corruption—not personal disputes. *See Lindsey*, 491 F.3d at 899. Plaintiff identified improper acts or omissions by certain individuals in Wentzville *in order to explain the potential fraud or corruption*— not to personally attack individuals. (App. 1177-79, 1181-99). The fact Bolderson disagreed with certain individuals' acts and omissions, or expressed her disagreement to specific individuals, does not *ipso facto* transform her broad concerns about fraud and corruption into "personal attacks." *See, e.g.*, *Hall v. Missouri Highway and Transp. Comm'n*, 995 F. Supp. 1001, 1009 (E.D. Mo.

57

1998) (noting "[a]lthough many of these complaints arose in personal disputes, they clearly touch upon matters of public concern").

### iii. The District Court Misconstrued Record Evidence In Concluding Plaintiff's Speech Impeded Her Ability To Perform Her Job Duties.

The District Court erroneously relied upon speculative testimony by Forebeck, removed from context, in support of its conclusion Bolderson's activities impaired her ability to perform her own duties. The District Court stated: "plaintiff's concerns regarding the activities of the HBA '**probably** affect[ed] her day-to-day operations and how she was performing.'" (App. 1758). (emphasis added). Forebeck's testimony in context, however, reads:

Q:     Did Miss Bolderson, in your experience, have almost an obsession with some kind of a conspiracy involving the HBA?

[Plaintiff's Counsel]: **I'm going to object, this is speculative.**

Q:     (By [Defendant's Counsel])  You can answer.

A:     **I think** the topic and the allegations that she felt were certainly consuming her mind.  And **probably affecting** her day-to-day operations and how she was performing.  **I think** it was consuming her.

Q:     You feel that it was interfering with the performance of her job and some allegation of fraud these complaints she was making on a regular basis?

A:     Yeah, **I don't know if I could quantify that**.  **I think that practically speaking if you're that worried about a particular issue, it might affect your amount of work that**

58

> **you could produce or quality possibly of the work that you do**.

Q:    Some of these reports that she filed were very lengthy. Would you have preferred her to spend her time doing other work in her department than spending exhaustive amounts of effort crafting these very lengthy complaints?

[Plaintiff's Counsel]:    **I'm going to object to that, assuming facts that are not in evidence. There is no evidence that she drafted these on work time, she could have done these on her own free time outside of work. Subject to that, you can answer if you know.**

A:    **I would hope and I would make the supposition that Diane was not using the City of Wentzville's time to craft any of these documents, that she was doing that off time.** She is an exempt employee.

(App. 550-552; Forebeck Dep. 173:20-175:3) (emphases added). Forebeck's testimony (to which Plaintiff's counsel timely objected) was exclusively couched in terms of unsubstantiated opinions and hypothetical conjecture. Forebeck admitted he could not actually answer the leading questions posed by Defendant's counsel. The District Court's reliance on Defendant's speculation as "evidence that plaintiff's activities impaired her ability to perform her own duties" is misplaced.

*Porter v. Dawson Educ. Serv. Co-op,* 150 F.3d 887, 894-95 (8th Cir. 1998) is unavailing because it is factually inapposite. (App. 1758-59). In *Porter*, the plaintiff—a public employee responsible for coordinating special education

59

services for children in various school districts—objected to the Arkansas Department of Education ("ADE") requiring names of children in the special education programs. *Id*. at 890. The ADE required names due to its own federal reporting requirements, in addition to ensuring children were not receiving duplicate services. *Id.* at 889-90. A parent challenged the ADE requirement in federal court, but the district court dismissed the action, "finding that the confidentiality of student information was reasonably protected and that the students' names could be included in the child count reports." *Id*. at 890. Nonetheless, the plaintiff thereafter shared her concerns about the issue with a newspaper outlet. *Id*. The newspaper published an article, causing an "urgent" situation and meeting among school district superintendents. *Id*. An ADE audit of these programs followed this meeting based on other concerns expressed during it. *Id*. The ADE audit revealed, *inter alia*, the plaintiff "had not been adequately performing her job," "had refused to cooperate with the ADE audit team," and "had continued to maintain that disclosing the students' names in the child count reports violated student confidentiality." *Id*. at 891. Evidence at trial further suggested the plaintiff's objections were motivated out of a concern the release of children's information would highlight improprieties and compliance issues in her programs. *Id*. at 894.

60

The *Porter* court noted the plaintiff "was entitled to dispute the validity of the release of confidential information to…the ADE." *Id.* at 894. However, after the district court heard and ruled on the parent's challenge and after the plaintiff's employer decided to release the information, the employer "had a legitimate interest in appellant's compliance with the release of the requested information." *Id.* Despite this legitimate interest, the plaintiff "continued to dispute the validity of the [district court's] decision, failed to cooperate with [school district] supervisors, refused to attend [school district] advisory committee meetings, continued to challenge ADE policy, and made [the employer's] attempted compliance with court orders extremely difficult." *Id.* The *Porter* court concluded the plaintiff's "compulsive" behavior "impeded her ability to perform her duties" and "undermined the effective operation of the workplace." *Id.* at 895.

Here, unlike *Porter*, the record evidence does not suggest Bolderson exhibited "compulsive" behavior about issues already raised, addressed and resolved. Defendant rushed a bidding process under circumstances creating a reasonable inference of improper collusion and misuse of taxpayer money. Bolderson identified for Defendant the circumstances creating this reasonable inference. (App. 1177-79, 1181-99). Defendant largely ignored her concerns and did not investigate them prior to her termination. (App. 744-45, 799). In fact, Defendant terminated Bolderson just four (4) days after her May 6, 2013 Memo

61

addressing potential fraud and corruption in Wentzville. The record is devoid of any indication Bolderson refused to perform her job duties, or otherwise irrationally persisted in raising concerns already addressed by a court of law, as in *Porter*. A reasonable analogy cannot be drawn between Forebeck's speculative testimony that Bolderson's concerns "probably affect[ed]" her job performance and the extensive evidence of compulsion in *Porter*.

> iv. **The District Court's Finding That Employee Acts of Insubordination Tipped The Balance Of The *Pickering* Factors In Favor Of Defendant Lacks Any Basis In The Record Evidence.**

The District Court failed to cite to any record evidence of "employee acts of insubordination" that "tip the balancing process" in favor of Defendant. The District Court stated: "McDowell believed that plaintiff violated a direct order from his predecessor that she not communicate with the mayor." The District Court further noted no evidence indicated McDowell knew Mayor Guccione had rescinded this directive. Accordingly, the District Court concluded Bolderson had been insubordinate by contacting Mayor Guccione (through his wife).

The District Court's analysis lacks merit primarily for three reasons. First, logically speaking, a mistaken belief as to whether one violated an order cannot prove whether an order was violated. Second, the District Court again contradicted itself by not limiting its analysis to the speech in question—that is, the April 22, 2013 Memo and May 6, 2013 Memo. (App. 1751) (stating "the Court's analysis

62

will be restricted to the documents plaintiff sent to city officials on April 22nd and May 6th, 2013"); *see also Lindsey*, 491 F.3d at 901. Third, the District Court relied on a "belief" of McDowell that Bolderson had violated an order from a predecessor, which is not contained within the record evidence. McDowell (who died in or around August 2013) never testified in this lawsuit. The District Court notably omitted citation to record evidence here because it does not exist. Even if the record contained evidence reflecting McDowell's purported "belief" (it does not), this would be inadmissible to prove the truth of the matter asserted (*i.e.*, that Bolderson actually violated a direct order).

The District Court failed to properly consider and weigh the record evidence in concluding Bolderson's April 22, 2012 Memo and May 6, 2013 Memo merited termination under *Pickering*. The District Court's conclusions regarding the alleged "insubordination" and "disruption" resulting from Bolderson's speech are unfounded. At the very least, the record evidence demonstrates genuine disputes as to material facts remain regarding whether Bolderson's termination was "justified" under *Pickering*.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the District Court's decision granting Defendant's summary judgment motion on Plaintiff's claim brought pursuant to 42 U.S.C. § 1983 be reversed.

63

Respectfully submitted,

By:     /s/ Kevin J. Dolley
        Kevin J. Dolley
        Mark J. Obermeyer
        LAW OFFICES OF KEVIN J. DOLLEY, LLC
        2726 S. Brentwood Blvd.
        St. Louis, MO 63144
        (314) 645-4100 (office)
        (314) 736-6216 (fax)
        kevin@dolleylaw.com
        mark@dolleylaw.com

        Ryan C. Mielcarek
        MIELCAREK LAW FIRM, LLC
        2726 S. Brentwood Blvd.
        St. Louis, MO 63144
        (314) 645-4100 (office)
        (314) 736-6216 (fax)
        ryan@rcmlawfirm.com

        *Attorneys for Plaintiff-Appellant*

Dated this 1st day of February, 2016.

64

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the textual portion of the foregoing brief (exclusive of the tables of contents and authorities, certificates of counsel, service, and compliance) contains 13,904 words as determined by the word counting feature of Microsoft Word 2013.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in proportionally spaced typeface in 14 point, Times New Roman.

Pursuant to Circuit Rule 28A(h), I also hereby certify that electronic files of this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

/s/ Kevin J. Dolley
*Counsel for Plaintiff-Appellant*

Appellate Case: 15-3846     Page: 73     Date Filed: 02/02/2016 Entry ID: 4362766

# CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, and Eighth Circuit Rule 25A(a), I hereby certify that I have on this 1st day of February 2016, filed a copy of the foregoing, along with the accompanying Addendum, with the Clerk of the Court through the Court's CM/ECF system, which will serve electronic copies on all registered counsel.

/s/ Kevin J. Dolley
*Counsel for Plaintiff-Appellant*

Appellate Case: 15-3846    Page: 74    Date Filed: 02/02/2016 Entry ID: 4362766